J-S09031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.P.D.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2989 EDA 2019 |

Appeal from the Decree September 25, 2019
In the Court of Common Pleas of Chester County Orphans' Court at
No(s):  AD-17-0031

BEFORE:   SHOGAN, J., LAZARUS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED MARCH 31, 2020**

Appellant, J.H. ("Father"), files this appeal from the decree dated September 24, 2019, and entered September 25, 2019,[1] in the Chester County Court of Common Pleas, granting the petition of the Chester County Department of Children, Youth and Families ("CYF") and involuntarily terminating his parental rights to his minor, dependent son, A.P.D.H., born in

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The subject decree was dated September 24, 2019.  However, notice pursuant to Pa.R.C.P. 236(b) was not provided until September 25, 2019.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."  ***Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999).

October 2009 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[2]  After review, we affirm.

The orphans' court summarized the procedural and factual history as follows:

> On January 22, 2019, [CYF] filed Petitions for Involuntary Termination of Parental Rights of [Mother] and [Father] of [Child]. Hearings were held on May 29 and September 6, 2019.[3], [4]  [CYF] seeks to terminate the parental rights under Sections []2511(a)(1), (2), [] (5) and (8) of the Adoption Act, 23 Pa. C.S.[]

---

[2] By separate decree dated and entered same date, the orphans' court also involuntarily terminated the parental rights of A.H. ("Mother") pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  Mother has not filed a separate appeal and has not participated in the instant appeal.

[3] CYF filed prior termination petitions on April 28, 2017, and amended thereafter as to Mother, which were denied by decree dated March 13, 2018, and entered March 14, 2018.  **See** Exhibit M-2.  By order of October 29, 2018, CYF was directed to again file with respect to termination.  **See** Exhibit CYF-1, Permanency Review Order, 10/28/18, at 3; **see also** N.T., 9/6/19, at 60.

[4] Mother and Father were present and represented by counsel.  We observe that, while present, Father is serving a 13-to-26-year sentence related to a conviction in Lycoming County, Pennsylvania and was to be sentenced in July 2019 related to a conviction in Chester County, Pennsylvania.  **See** N.T., 5/29/19, at 11-12; **see also** CYF Exhibit 3.  Additionally, Child was represented by counsel, as well as a guardian *ad litem*, during these proceedings.  **See In re Adoption of L.B.M.**, 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); **see also In re T.S.**,192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (finding the preferred outcome of a child who is too young or non-communicative unascertainable in holding a child's statutory right to counsel not waivable and reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests).  We note, however, our recent opinion in **In re: Adoption of K.M.G.**, 219 A.3d 662 (Pa. Super. 2019) (*en*

We make the following Findings of Fact.

1. Mother was sixteen[]years[]old when she met Father online. He was fifty[]years old. Mother was seventeen when she and Father met in person. Mother and Father married in 2007.[5]

2. [Child] was born [in October, 2009].

3. Early in Mother['s] and Father's relationship, Father introduced Mother to viewing child pornography on the Internet. Mother viewed child pornography with Father in the context of their sexual relationship. She did not view child pornography when she was not with him.

4. In 2015, police investigated Father and Mother after a report that the parents and other adults engaged in sexual activity in a public restroom in Carbon County, Pennsylvania while [Child] was present. Police executed a search warrant on the parents' home and found child pornography in the residence.

5. In December, 2015, Father was arrested and charged with criminal solicitation, involuntary deviate sexual intercourse

---

*banc*), *granting appeal in part*, 221 A.3d 649 (Pa. 2019) (holding that this Court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation). CYF presented the testimony of Gerald A. Menaquale, Jr., Clinical Director, Commonwealth Clinical Group; Stephen Miksic, Ph.D., licensed psychologist, who conducted evaluations of Mother and Child at the request of CYF and was qualified as an expert in the area of child psychology with a subspecialty of bonding and attachment; Kenneth Rohrbach, psychotherapist, Commonwealth Clinical Group, who served as Mother's therapist; Kasie Collester, therapist, Commonwealth Clinical Group, who served as Child's therapist; and Amanda Chan, Foster Care Supervisor, CYF. CYF additionally presented Exhibits CYF-1 through CYF-8, which were admitted without objection. While Mother testified on her own behalf and presented Exhibits M-1 and M-2, Father offered no evidence.

[5] Mother confirmed that, at the time of marriage, she was approximately twenty to twenty-one years old. N.T., 9/6/19, at 124.

with a child, trafficking in minors, sexual assault and other offenses in Lycoming County. He was also charged with child pornography in Chester County.

6. Mother was charged with possession of child pornography.

7. On December 5, 2015, Mother signed a voluntary placement agreement, giving custody of [Child] to [CYF]. [C]hild was removed from the home and placed in foster care. [CYF] has continued to assume custody of [Child] since December 5, 2015.

8. [Child] was examined for physical signs of sexual abuse. The results were negative.

9. [CYF] determined that [Child] was a victim of sexual abuse by being in the home when Mother and Father viewed child pornography.[6]

10. In 2017, Father was convicted in Lycoming County of involuntary deviate sexual intercourse with a child and other offenses.[7] On December 18, 2017, Father was sentenced to 13 to 26 years in prison.

11. On May 7, 2019, Father was convicted in Chester County of possession of child pornography. He is awaiting sentencing.

12. On December 6, 2017, Mother pled guilty to recklessly endangering another person ([Child]). She was sentenced to two years of probation. The charges relating to possession of child pornography were withdrawn in exchange for her testimony against Father.

---

[6] Child was adjudicated dependent on December 29, 2015 and found to be a victim of abuse pursuant to 23 Pa.C.S. § 6303. N.T., 9/6/19, at 55.

[7] Father was convicted of, among other things, criminal solicitation-involuntary deviate sexual intercourse with a child, trafficking in minors, criminal solicitation-sexual assault, criminal solicitation-sexual exploitation of children, criminal solicitation-aggravated indecent assault. *See* N.T., 5/29/19, at 11-12; *see also* Exhibit CYF-3.

13. Mother's visits with [Child] have always been supervised. Mother currently sees [Child] twice a week for three hours each.

14. Mother attends biweekly psychosexual counseling sessions with Commonwealth Clinical Group.

15. Mother maintains full[-]time employment and has stable housing.

16. Since his incarceration, Father has had no contact with [Child] other than the occasional note [C]hild through [CYF]. The Dependency Court Orders state that visitation with Father is contrary to the safety and well-being of [Child].

17. The Dependency Court Orders of October 29, 2018 and March 25, 2019 state that Mother made minimal progress toward alleviating the circumstances that led to placement of [Child].

18. The Dependency Court Orders of October 29, 2018 and March 25, 2019 state that Father made no progress toward alleviating the circumstances that led to placement of [Child].[8]

Adjudication, 9/25/19, at 1-3 (footnote omitted) (citations to record omitted).

By decree dated September 24, 2019, and entered September 25, 2019, the orphan's court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The court issued an adjudication along with its decree, noting its reasoning. On October 23, 2019, Father, through appointed counsel, filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

_____

[8] Upon review, the Permanency Review Orders of March 25, 2019, October 29, 2018, March 23, 2018, June 6, 2017, January 10, 2017, July 14, 2016, and April 14, 2016 contained findings that Father made "no progress toward alleviating the circumstances which necessitated that original placement." Exhibit CYF-1. The Permanency Review Order of August 29, 2017 and October 18, 2016 contained a finding of minimal progress. *See id.*

1925(a)(2)(i) and (b). Thereafter, on November 13, 2019, the court issued a Statement of the Court, indicating, "The issues on appeal were adequately covered by our September 24, 2019 Adjudication and Final Decree. We submit the Adjudication in response to the Concise Statement of Errors Complained of on Appeal filed by [Father]." Statement of the Court, 11/13/19.

On appeal, Father raises the following issue for our review:

Whether the Orphans' Court abused its discretion and/or erred as a matter of law in terminating Father's parental rights while failing to give due consideration to Father's substantial and full compliance with the permanancy [sic] plan during the time periods encompassed by Permanency Review Orders dated January 10, 2017, June 6, 2017, August 29, 2017, March 23, 2018 and March 25, 2019?

Father's Brief at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

- 6 -

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court, in addressing Section 2511(a)(2), concluded

incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without

essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.* at 328-29, 828; *see also In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (holding that incarceration prior to the child's birth and until the child was at least age seven renders family reunification an unrealistic goal and the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow court's initial directive that reunification efforts be made). The Court in *S.P.* further stated,

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.,* 515 A.2d [883, 891 (Pa. 1986)] ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re*] *E.A.P.,* 944 A.2d [79, 85 (Pa. Super. 2008)](holding termination under § 2511(a)(2) was supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

*In re Adoption of S.P.*, 47 A.3d at 830 (footnote omitted).

Further, as to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love,

- 10 -

> comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

- 11 -

In the case at bar, in finding grounds for termination of Father's parental rights and that such termination favored Child's needs and welfare, the orphans' court stated:

Father has been incarcerated since December of 2015. He was sentenced in Lycoming County to 13 to 26 years in prison and is awaiting sentencing in Chester County. The fact of incarceration does not, in itself, provide grounds for the termination of parental rights. [*In re B., N.M.*], 856 A.2d 847, 855 (Pa. Super. 2004).

Father's only contact with [Child] is the occasional note to the child through [CYF]. The Dependency Court Orders state that visitation with Father is contrary to the safety and well-being of [Child]. Father poses a grave risk to [Child]'s safety due to his sexual proclivities and desire to view child pornography.

I find that the repeated and continued abuse [by] Father has caused [Child] to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Father. . . . Additionally, I find that . . . termination of parental rights would best serve the needs and welfare of [Child]. [Child] has not seen Father in three and a half years. Whatever bond the child had with Father was not a healthy, secure bond. Thus, I find that terminating Father's parental rights would have no adverse effect on [Child].

I find clear and convincing evidence that the developmental, physical and emotional needs and welfare of [Child] will be best promoted by terminating the parental rights of Father.

Adjudication, 9/25/19, at 18-19 (citations to record omitted).

Father, however, argues that, despite incarceration, he acted in good faith to preserve his relationship with Child. Father's Brief at 12-13. Father states as follows:

In terminating Father's parental rights, the Orphan's Court failed to give due consideration to Father's substantial and full

compliance with the permanency plan during the time periods encompassed by Permanency Review Orders dated January 10, 2017, June 6, 2017, August 29, 2017, March 23, 2018 and March 25, 2019. These Permanency Review Orders are contained in CYF Exhibit 1[,] which is part of the reproduced record (No. 61) and attached hereto in Appendix D. "Incarceration of a parent does not, in itself, provide sufficient grounds for termination of parental rights; however, an incarcerated parent's responsibilities are not tolled during his incarceration. Parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities. Further, parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." [*In re C.S.*], 761 A.2d 1197, 1201 (Pa. Super. 2000). In failing to consider Father's substantial and full compliance with the permanency plan during the time periods encompassed by Permanency Review Orders dated January 10, 2017, June 6, 2017, August 29, 2017, March 23, 2018 and March 25, 2019, the Orphan's Court failed to adequately access [sic] whether Father acted affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his ability while he was incarcerated.

*Id.*

A review of the record supports the orphans' court's finding of grounds for termination under Section 2511(a)(2). Significantly, the record reveals that Father has been incarcerated since December 2015, since Child's placement at six years old, and is serving a thirteen-to-twenty-six-year sentence stemming from the charges from Lycoming County. Moreover, Father was still to be sentenced as to the child pornography charges out of Chester County. *See* N.T., 5/29/19, at 11-12; N.T., 9/6/19, at 50, 62-63; *see also* Exhibit CYF-3. Significantly, Amanda Chan, CYF foster care supervisor, testified as follows as to Father:

Q.  Has [Father] demonstrated a parental incapacity concerning [Child]'s wellbeing, physical or mental?

A.  Throughout the time that I've supervised this case[,] [Father] has been incarcerated and he's currently serving 13 to 26 years, which would leave [Child] without proper parental control, parental capacity.

Q.  Have you observed anything over the course of your involvement in this case to suggest that [Father] will or is able to correct or remedy the causes of that parental incapacity?

A.  I don't believe that he's going to be able to get out of jail within a reasonable amount of time.  He has written [Child] letters and communicated with him to the best of his ability, but I believe it would take more than that.

Q.  Do the conditions which originally led to the placement of [Child] continue to exist?

A.  Yes.

Q.  What were the original conditions that led to the placement of [Child]?

A.  The original – originally [Child] came into care due to the criminal activity of his father and the fact that his mother was living in that situation.  . . .

N.T., 9/6/19, at 62-63.

It is thus unlikely that Father will be released from incarceration prior to Child reaching majority.  Even if released from incarceration, it would be speculative to conclude that Father would be in a position to care for Child at such a time.  This prospect is simply unacceptable for Child, who, at the time of the hearing, had already been in care for almost four years.  As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The

court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

As to subsection (b), upon review, we again discern no abuse of discretion. The record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

At the time of the hearing, despite some contact through letters, Father had not seen Child in almost four years. Moreover, Child is in a foster home where he has resided for almost four years, and where his needs are being met. N.T., 9/6/19, at 17, 19, 49, 52, 57-58, 64. As described by CYF foster care supervisor, Amanda Chan, with respect to Child and his foster parents,

"He gets along very well.  They all seem to have a very loving and trusting relationship and know about each other. . . ." *Id.* at 64.  As to her observation of this bond, Ms. Chan further explained,

> I base it on the home visits that I've been on with [Child] and the [foster] family.  I have seen [Child] look to them.  I have seen the support and love between them, and when [Child] talks to me who is someone that he's not as familiar with, he looks to the [foster family] for reassurance.  He appears comfortable in their home. They're very familiar with his education and his school needs.

*Id.* at 52.  Similarly, Child's therapist, Kasie Collester, testified to this positive relationship.  "They actually have good relationship.  He calls them mom and dad regularly." *Id.* at 17.  She continued, "He's got a good relationship with them.  He has probably most of his memories at that home.  And so it would be, I think, an easy transition for him to remain there." *Id.*  Despite noting a good relationship with Mother, Ms. Collester further recognized that Child "really gravitate[s]" towards his foster parents. *Id.* at 23-24.  As such, Ms. Chan opined that termination would best serve Child's needs and welfare.  She stated, "Yes.  I believe strongly that Child needs permanency.  I believe that he needs to know where he's going to be and who is going to be there for him and to have those roles be defined permanently so that he can feel secure." *Id.* at 65.  In addition, acknowledging Child's desire to have both his foster parents and his mother in his life, Ms. Collester testified that she would be in favor of permanency for Child and recommended he remain with his foster parents, stating, "My recommendation has remained the same.  I think that he should remain with [foster parents], but I agree that it would be healthy

for him to continue to have contact with his mother." ***Id.*** at 18-19. Ms. Collester explained,

> They have provided a stable environment for him. They have their resources to help him, both in school and with counseling. He needs a lot of support with schooling, especially, and they have the time and availability to do so. They have been consistent with him. And, to my understanding, from what I have seen, they have good boundaries as well.

***Id.*** at 19.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. At the time of the hearing, Child had been in placement for almost four years, and is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id***. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).[9]

Decree affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/31/2020

---

[9] We observe that due to the lack of merit to Father's argument, CYF asserts that Father's appeal is frivolous and that counsel should have filed an ***Anders*** brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and extended to appeals involving the termination of parental rights ***In re V.E. & J.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992).  CYF's Brief at 9-11.